IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Brian Musgrave, | ) | Civil Action No.: 2:25-cv-01823-RMG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| Nancy Mace and Jane/John Does 1-5, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' MOTION TO SUBSTITUTE
AND MEMORANDUM IN SUPPORT THEREOF**

The United States, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2679(d),

moves to be substituted as the sole defendant on the majority of the claims in the above-captioned

civil action in place of the Honorable Nancy Mace, United States Representative for the First

Congressional District of South Carolina ("Congresswoman Mace") and Jane/John Does 1-5

("Doe Defendants").[1] The United States should be substituted as the defendant on the causes of

action for libel *per se*, defamation *per se*, and conspiracy because the statements about which

Plaintiff Brian Musgrave ("Plaintiff") complains were made during the course and scope of

Congresswoman Mace's office and employment as a Member of the United States House of

Representatives ("House") and the Doe Defendants' office and employment as Congressional

staff. The FTCA requires that the United States be substituted as the defendant where, as

---

[1] Pursuant to Local Civ. Rule 7.04 (D.S.C.), the United States submits this motion without
a separate memorandum because a full explanation of the motion is set forth herein and a separate
memorandum would serve no useful purpose.

Furthermore, in accordance with Local Civ. Rule 7.02 (D.S.C.), the United States consulted
with Plaintiff's counsel prior to filing this motion to substitute itself as the defendant, and
Plaintiff's counsel stated that they would consider the motion to substitute.

here, the "defendant employee[s] [were] acting within the scope of [their] office or employment at the time of the incident out of which the claim arose . . . ." 28 U.S.C. § 2679(d)(1).

## I. BACKGROUND

### A. Factual Background[2]

Defendant Nancy Mace is a Congresswoman representing the Lowcountry of South Carolina in the House. *See* ECF No. 20, First Amended Complaint ("Am. Compl.") ¶ 2.

On the evening of February 10, 2025, Congresswoman Mace delivered a speech on the House Floor "sharing allegations involving her personal story of rape, voyeurism and sex trafficking at the hands of her ex-fiancé . . . ." *Id.* at 1. *See also* ECF No. 20-1 (pre-released version of the speech).[3] In her floor speech, Congresswoman Mace discussed how her own experience of sexual assault and her experience uncovering evidence of sexual assault against a number of victims in her Congressional district prompted her to introduce "legislation to protect women and girls . . . ." ECF No. 20-1 at 15.

The Congresswoman's speech discussed twelve bills that she introduced to address these issues, namely "The Sue VOYEURS Act[,]" "The Stop VOYEURS Act[,]" "H.R. 7567[,]" "The Violence Against Women by Illegal Aliens Act[,]" "The Safe Shelters Act[,]" "The Rape Shield

---

[2] The United States restates Plaintiff's factual allegations from the First Amended Complaint (ECF No. 20) for purposes of this motion but makes no concession or admission as to their accuracy.

[3] The recording of Congresswoman Mace's speech is available on the Congresswoman's governmental website. *See* "Rep. Nancy Mace Delivers EXPLOSIVE Speech on House Floor About Sex Crimes Against Women and Girls," Office of Congresswoman Nancy Mace, *available at* https://mace.house.gov/media/blog-post/rep-nancy-mace-delivers-explosive-speech-house-floor-about-sex-crimes-against-women (Feb. 11, 2025) (last accessed July 10, 2025) (hereinafter, "Recording"). "Courts may take judicial notice of governmental websites." *Hilton v. Gossard*, 702 F. Supp. 3d 425, 430 (D.S.C. 2023) (internal citation omitted). *See also Mays v. Smith*, 70 F.4th 198, 206 n.4 (4th Cir. 2023) (taking judicial notice of information on a federal-government agency's website).

Enhancement Act[,]" "the Stop the Invasion of Women's Spaces Act[,]" "The Protecting Women's Private Spaces Act[,]" "The Prison Rape Prevention Act[,]" "The VANISH Act[,]" "H.R. 8180[,]" and "H. Res. 1579 . . . ." ECF No. 20-1 at 15-16. During the speech, the Congresswoman displayed several posters, including one that listed these bills and another that included Plaintiff's "name and picture with the title, 'Predators.'" Am. Compl. ¶ 59; Recording at 5:45; 36:20.

Plaintiff alleges that, before the Congresswoman delivered her speech, a copy of the text was shared with the press. *See* Am. Compl. ¶ 54. The pre-released version of the speech mirrors the as-delivered version almost entirely. *Compare* ECF No. 20-1 *with* Recording. The pre-released version mentions Plaintiff, by name, five times. First, Plaintiff is named with three other men alongside the statement, "I would never allow any woman or underage girl anywhere near any of you." ECF No. 20-1 at 4. Second, the speech includes the following statement: "[t]o . . . Brian Musgrave, . . . this is your pilot speaking. You've booked yourself a one-way ticket to hell. Nonstop. No connections. So I, and ALL of your victims, can watch you rot for an eternity." *Id.* at 5. Third, the speech alleges that a hidden camera used to record women without their knowledge or consent, including Congresswoman Mace, "was located at a property Patrick Bryant owns with one of his business partners named Brian Musgrave." *Id.* at 6. Fourth, the speech indicates that Congresswoman Mace was "at a property owned by Patrick Bryant and Brian Musgrave[,]" when she was given two small vodka sodas that caused her to black out. *Id.* at 9. And finally, the speech calls on women who had "visited properties owned by Patrick Bryant and Brian Musgrave . . ." to reach out to Congresswoman Mace's hotline. *Id.* at 17-18.

Plaintiff also alleges that the Congresswoman's social media accounts contained multiple posts relating to the speech. *See* Am. Compl. ¶¶ 71, 74, 78, 83, 88, 91, 93, 95, 100. Furthermore,

he asserts that "Congresswoman Mace chose to hang the poster of the 'Predators' in a public space in or near her Congressional office . . . ." *Id.* at ¶ 87.

On March 14, 2025, Plaintiff filed a 37-page Complaint containing over 180 numbered paragraphs and 13 causes of action, including 10 causes of action solely against Congresswoman Mace and three causes of action against Congresswoman Mace and the Doe Defendants. *See* ECF No. 1, Complaint ("Compl."). The Complaint attached eight exhibits, including the pre-released version of the Congresswoman's speech (ECF No. 1-1, Compl. Exhibit A) and copies of X posts (ECF Nos. 1-2 –1-8, Complaint Exhibits B, C, D, E, F, G, & H).

On June 9, 2025, Plaintiff filed a Notice of Motion and Motion to Amend the Complaint ("Plaintiff's Motion") with Defendants' consent. *See* ECF No. 16. Plaintiff's Motion attached his First Amended Complaint. *See* ECF No. 16-1. Thereafter, this Court granted Plaintiff's Motion on June 17, 2025. *See* ECF No. 19. This Court also allowed Defendants to respond to the First Amended Complaint by July 11, 2025. *See* ECF No. 18.

Plaintiff's 43-page First Amended Complaint contains over 200 numbered paragraphs and 15 causes of action, including 12 causes of action solely against Congresswoman Mace and three causes of action against Congresswoman Mace and the Doe Defendants. *See* ECF No. 20. The First Amended Complaint cites the same exhibits that were attached to Plaintiff's Complaint, including the pre-released version of the Congresswoman's speech (ECF No. 20-1, Am. Compl. Exhibit A) and copies of X posts (ECF Nos. 20-2 –20-8, Am. Compl. Exhibits B, C, D, E, F, G, & H). *See also* Am. Compl. ¶¶ 54-57, 71-72, 74-76, 78-81, 88-89, 91-96.

Regarding the claims only against the Congresswoman, the First Amended Complaint asserts eleven claims for libel *per se*, *see* Am. Compl. ¶¶ 125-192 (Causes of Action 1-11), and one "Bivens claim," *Id.* at 39, seeking actual and punitive damages. Like the Complaint, the First

Amended Complaint's separate claims against Congresswoman Mace concern "[t]he written version of the speech that Defendant Mace released for publication[,]" *id.* at ¶¶ 125-130 (Cause of Action 1), social media posts on X, *see id.* at ¶¶ 131-154 (Causes of Action 2-5), ¶¶ 161-178 (Causes of Action 7-9), the hanging of the poster near Congresswoman Mace's Congressional office, *see id.* at ¶¶ 155-160 (Cause of Action 6), and the speech delivered on the House Floor, *see id.* at ¶¶ 193-200 (Cause of Action 10). In addition, the First Amended Complaint adds two causes of action for libel *per se* relating to an X post on April 8, 2025, and an interview on April 11, 2025. *See id.* at ¶¶ 179-192 (Causes of Action 10-11).[4]

In the First Amended Complaint, Plaintiff continues to assert claims for actual and punitive damages against the Congresswoman and the Doe Defendants, alleging that the defendants defamed him, *see id.* at ¶¶ 201-206 (Cause of Action 13), and "combined together to inflict special harm on the Plaintiff[,]" *id.* at ¶¶ 207-210 (Cause of Action 14). Further, Plaintiff seeks permanent injunctive relief "to prevent the Defendants from continuing to defame the Plaintiff . . . ." *Id.* at ¶¶ 211-217 (Cause of Action 15).

### B. Statutory Background

The FTCA is "the exclusive remedy" for money damages for "a tort committed by '*any* employee of the Government' within the scope of employment . . . ." *United States v. Smith*, 499 U.S. 160, 166, 173 (1991) (quoting 28 U.S.C. § 2679(b)(1)) (emphasis in original). This includes "officers" in the legislative branch. 28 U.S.C. § 2671. *See also Williams v. United States*, 71 F.3d 502, 505 (5th Cir. 1995) ("A Member of Congress who holds an office in the U.S. House of

---

[4] The heading for the First Amended Complaint's "Eleventh Cause of Action as against Defendant Mace" states that this claim is for "Libel Per Se – February 14, 2025, 12:36 PM Post to X." Am. Compl. at 37. However, the allegations for this cause of action concern an "April 11, 2025, interview" by the Congresswoman—not a post to X. *Id.* at ¶¶ 187-189. The First Amended Complaint's ninth cause of action is for the "February 14, 2025, 12:36 PM Post to X." *Id.* at 35.

Representatives is clearly an employee or officer of the legislative branch of the federal government."); *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 109 (D. Mass. 1997), *aff'd*, 147 F.3d 68 (1st Cir. 1998), *cert. denied*, 525 U.S. 1102 (1999) ("[T]he Westfall Act expands immunity for members of Congress to provide protection for all acts taken by them within the scope of their employment.").

Congress amended the FTCA in 1988 by enacting the Federal Employees Liability Reform and Tort Compensation Act. *See* 28 U.S.C. § 2679. This amendment was in response to judicial decisions, "and particularly the decision of the United States Supreme Court in *Westfall v. Erwin*[, 484 U.S. 292 (1988), *superseded by statute*,] . . . [that] seriously eroded the common law tort immunity previously available to Federal employees." Pub. L. No. 100-694 § 2(a)(4), 102 Stat. 4563 (Nov. 18, 1988). In *Westfall*, the Supreme Court held that "absolute immunity from state-law tort actions should be available only when the conduct of federal officials is within the scope of their official duties *and* the conduct is discretionary in nature." 484 U.S. at 584 (emphasis in original). Congress responded to the *Westfall* decision by "establish[ing] the absolute immunity for Government employees that the Court declined to recognize under the common law in *Westfall*." *Smith*, 499 U.S. at 163. Known as the Westfall Act, the statute's purpose is "to protect Federal employees from personal liability for common law torts committed within the scope of their employment, while providing persons injured by the common law torts of Federal employees with an appropriate remedy against the United States." Pub. L. No. 100-694 § 2(b), 102 Stat. 4563, 4564. "The Westfall Act applies not only to negligent acts of a federal employee, but to intentional wrongs as well . . . ." *Childress v. United States*, No. 3:07-CV-03312, 2008 WL 6716458, at *2 (D.S.C. Mar. 13, 2008) (internal citation omitted).

The Westfall Act provides a mechanism for the United States to substitute itself as the defendant for employees sued individually. First, "the Attorney General of the United States, or his [or her] delegee, must certify that the defendant employees were acting within the scope of their employment at the time of the incident out of which the claim arose." *Doe v. Meron*, 929 F.3d 153, 160 (4th Cir. 2019) (citing 28 U.S.C. § 2679(d)(1)). United States Attorneys, by regulation, are authorized to issue such a certification. *See* 28 C.F.R. § 15.4.

"Following certification, the proceeding is deemed a tort action against the United States under the provisions of the FTCA." *Doe*, 929 F.3d at 160 (citing 28 U.S.C. § 2679(d)(1)). Thereafter, "the ball is in the plaintiff's court." *Doe*, 929 F.3d at 160. If a plaintiff does not challenge the scope-of-employment certification, "the certification is conclusive." *Id*. (internal citation omitted).

However, if a plaintiff opposes certification, the plaintiff bears the burden of "refut[ing] the certification of scope of employment issued by the Attorney General and . . . prov[ing] by a preponderance of the evidence that the defendants were not acting within the scope of their employment." *Maron v. United States*, 126 F.3d 317, 323 (4th Cir. 1997). *See Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1155 (4th Cir. 1997), *cert. denied*, 522 U.S. 931 (1997) ("In short, the scope-of-employment certification is prima facie evidence that the defendant federal employee[s] acted within the scope of [their] employment, thereby placing the burden on the plaintiff to prove otherwise."). To meet that high burden, the plaintiff must present "'specific evidence or the forecast of specific evidence that contradicts the Attorney General's certification decision . . . .'" *Borneman v. United States*, 213 F.3d 819, 827 (4th Cir. 2000), *cert. denied*, 531 U.S. 1070 (2001) (quoting *Gutierrez*, 111 F.3d at 1155). "More specifically, [the plaintiff] must, at minimum, present or forecast evidence that shows that the conduct of the officers and employees

at issue did not involve the type of work they were employed to perform, occurred outside authorized space and time[,] or was purely personal in nature." *Doe*, 929 F.3d at 165 (internal citations omitted). "To do this, a plaintiff may rely on the pleadings, affidavits[,] or any other supporting documentary evidence[,]" but not "conclusory allegations and speculation." *Id.* (internal citation omitted). "If the plaintiff presents persuasive evidence refuting certification, the government must provide evidence and analysis supporting its conclusion that the conduct at issue was carried out within the scope of employment." *Id.* at 161 (internal citation omitted).

The Fourth Circuit "recognize[s] the desirability of quickly resolving the scope-of-employment issue because immunity under the Westfall Act . . . is an *immunity from suit* rather than a mere defense to liability." *Borneman*, 213 F.3d at 827 (internal quotation marks and citation omitted) (emphasis in original). District courts thus "should remain cognizant of the considerations weighing against protracted litigation under the Westfall Act . . . ." *Id.* (internal quotation marks and citation omitted).

When analyzing FTCA scoping determinations, the district court "must apply the law of the state in which the alleged tort occurred to ascertain whether the federal employee was acting within the scope of his employment." *Id. See also Doe*, 929 F.3d at 164 (same); *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006) (per curiam) ("*CAIR*") (same).

## II. **ARGUMENT**

**A. The United States should be substituted as the sole defendant in place of Congresswoman Mace and the Doe Defendants on the claims for libel *per se*, defamation *per se*, and conspiracy.**

The United States should be substituted as the sole defendant in place of Congresswoman Mace and the Doe Defendants on the causes of action for libel *per se* (Causes of Action 1-11), defamation *per se* (Cause of Action 13), and conspiracy (Cause of Action 14). As explained more

fully below, at all relevant times, Congresswoman Mace served as a Member of the House and the Doe Defendants, in their capacity as Congressional staff, aided Congresswoman Mace "in the conduct described" in the Amended Complaint. *See* Am. Compl. ¶¶ 2-3.

On June 23, 2025, the United States Attorney for the District of South Carolina made a scope-of-employment determination regarding Congresswoman Mace and the Doe Defendants' alleged conduct. *See* Exhibit 1 (Certification of Scope of Employment Pursuant to 28 U.S.C. § 2679(d)) ("Certification"). The United States Attorney certified that Congresswoman Mace was acting within the scope of her employment as a Member of Congress at the time of the alleged incidents. *Id.* As for the Doe Defendants, the United States Attorney certified that they were acting within the scope of their employment as Congressional staff at the time the alleged conduct took place. *Id.* Although Plaintiff does not specifically identify the Doe Defendants as Congressional staff, the Amended Complaint describes the Congresswoman as a supervisor and the Does as agents or subordinates. *See* Am. Compl. at 3 ("Congresswoman Nancy Mace and *her team* . . .); *id.* at ¶ 45 ("Mace and Defendants Doe began meeting . . ."); *id.* at ¶ 50 ("Mace and *team* . . ."); *id.* at ¶ 53 ("Mace and *team* . . ."); *id.* at ¶ 59 ("Congresswoman Mace and *her team* . . ."); *id.* at ¶ 70 ("Mace and *team* . . ."); *id.* at ¶ 119 ("Congresswoman Mace and *her Jane Doe / John Doe* . . .") (emphasis added). Because the Doe Defendants were acting under Congresswoman Mace's instructions, the Certification provides that the Doe Defendants were acting within the scope of their employment as Congressional staff.

Under both the FTCA itself and case law, the Certification should result in substitution. *See* 28 U.S.C. § 2679(d)(1) (Upon certification, "the United States shall be substituted as the party defendant."); *Doe*, 929 F.3d at 160 ("Following certification, the proceeding is deemed a tort action against the United States under the provisions of the FTCA.") (citing 28 U.S.C. §

2679(d)(1)); *Robles v. Beaufort Mem'l Hosp.*, 482 F. Supp. 2d 700, 705 (D.S.C. 2007) (substituting the United States for individually-named defendant physicians); *Berkeley-Dorchester Ctys. Econ. Dev. Corp. v. U.S. Dep't of Health & Hum. Servs.*, 395 F. Supp. 2d 317, 322 (D.S.C. 2005) (providing that, "upon certification by the United States Attorney that [the individually-named defendant commissioner of the Head Start Bureau] was acting within the scope of her employment at the time of the alleged acts, the United States must be substituted . . . on the slander and conspiracy claims").

Plaintiff contends that the alleged conduct falls outside the scope of the defendants' employment. *See* Am. Compl. ¶¶ 117-118, 120. This Court is charged with determining whether Congresswoman Mace and the Doe Defendants were acting within the scope of their employment when the alleged conduct took place and thus whether substitution is proper. And the Court must make this determination "using the law of the state in which the tort occurred." *Maron*, 126 F.3d at 323-24 (internal citations omitted).

Plaintiff does not specifically allege where each of the complained-of actions took place. The Amended Complaint asserts generally that "a substantial part of the events or omissions giving rise to the claims" occurred in South Carolina, although the speech itself and the hanging of the poster outside of the Congresswoman's office took place in the District of Columbia. *See* Am. Compl. ¶¶ 5, 58, 87. In any event, the result is the same regardless of whether District of Columbia or South Carolina law applies: for FTCA purposes, both Congresswoman Mace's and the Doe Defendants' alleged tortious conduct falls within the scope of their respective employment.

1. **Under District of Columbia law, Congresswoman Mace and the Doe Defendants were acting within the scope of their employment.**

The District of Columbia generally "defines the scope of employment based on the test set out in the Restatement (Second) of Agency . . . ." *Bobulinski v. Goldman*, No. 24-cv-00974-AHA, 2025 WL 1707696, at \*2 (D.D.C. June 18, 2025) (internal citations omitted). "[T]he test for scope of employment is an objective one, based on all the facts and circumstances." *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009) (internal quotation marks and citation omitted). *See also Wilson v. Libby*, 535 F.3d 697, 711-12 (D.C. Cir. 2008).

Under this approach, a person acts within the scope of employment if his or her conduct (1) "'is of the kind [he or she] is employed to perform'"; (2) "'occurs substantially within authorized time and space limits'"; and (3) "'is actuated, at least in part, by a purpose to serve the master . . . .'" *Trump v. Carroll*, 292 A.3d 220, 228-29 (D.C. 2023) (quoting Restatement (Second) of Agency § 228). Regarding the latter requirement, "[t]he Restatement's text reveals that even a *partial* desire to serve the master is sufficient." *CAIR*, 444 F.3d at 665 (citing Restatement (Second) of Agency § 228(1)(c)) (emphasis in original).

The "District has broadly interpreted the test[,]" as the D.C. Circuit has observed. *Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013). *See Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008), *cert. denied*, 555 U.S. 881 (2008) ("Many states and D.C. apply the scope-of-employment test very expansively . . . [so much so, that] [t]he scope-of- employment test often is akin to asking whether the defendant merely was on duty or on the job when committing the alleged tort.").

On the first element, District of Columbia "law requires that [courts] focus on the type of act [the defendant] took that allegedly gave rise to the tort, not the wrongful character of that act." *Jacobs*, 724 F.3d at 221 (internal citation omitted). For defamation claims, the "appropriate

question . . . is whether that [communication]—not the allegedly defamatory sentence—was the kind of conduct [the defendant] was employed to perform." *CAIR*, 444 F.3d at 664 (internal quotation marks and citation omitted). When determining "the scope of an individual employee's job functions[,] [this] is not so narrowly construed as to cover only the conduct *expressly* authorized." *Trump*, 292 A.3d at 230 (emphasis in original) (internal citation omitted). There are often "informal responsibilities that are as integral to their employment as their formal responsibilities, and therefore just as sound of a basis for applying *respondeat superior* liability." *Id.* (internal citation omitted). For example, the "legislative duties of Members of Congress are not confined to those directly mentioned by statute or the Constitution[, but also include] . . . serv[ing] and respond[ing] to [their] constituents." *CAIR*, 444 F.3d at 665 (internal quotation marks and citations omitted).

Further, an employee's conduct has been found to be within the scope of his or her employment if the conduct is "of the same general nature as that authorized, or incidental to the conduct authorized." Restatement (Second) of Agency § 229(1). *See Bancoult v. McNamara*, 445 F.3d 427, 437-38 (D.C. Cir. 2006), *cert. denied*, 549 U.S. 1166 (2007) (quoting Restatement (Second) of Agency § 229(1)); *Trump*, 292 A.3d at 230-31 ("As to whether the tortious conduct was 'incidental to' the unauthorized conduct, we view this language as an inquiry into whether the tortious conduct was undertaken *in service of* carrying out an employee's job function.") (emphasis in original).

The conduct at issue here is "of the kind [Congresswoman Mace] is employed to perform . . . ." Restatement (Second) of Agency § 228(1)(a). As noted above, District of Columbia law requires courts to "focus on the type of act [the defendant] took that allegedly gave rise to the tort, not the wrongful character of that act." *Jacobs*, 724 F.3d at 221 (internal citation omitted).

Therefore, the question is whether the conduct at issue (the speech on the House floor, the release of the Congresswoman's speech to the press, the hanging of the poster, the media interview, and the social media posts)—"not the allegedly defamatory sentence"—"was the kind of conduct [the Congresswoman] was employed to perform." *CAIR*, 444 F.3d at 664 (internal citations omitted).

Members of Congress conduct a wide range of activities far beyond those considered purely "legislative" duties, which most emphatically include making statements about matters of public concern. Outside the FTCA context, the Supreme Court has observed that:

> Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate "errands" performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, *preparing so-called "news letters" to constituents, news releases, and speeches delivered outside the Congress*. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections.

*United States v. Brewster*, 408 U.S. 501, 512 (1972) (emphasis added) (describing the aforementioned activities as "entirely legitimate").

The core of Plaintiff's Complaint arises from the Congresswoman's speech on the House floor—which Plaintiff concedes was made while she was "a federal official acting under federal authority." Am. Compl. ¶ 194. Delivering such a speech, which concerned "legislation to protect women and girls," ECF No. 20-1 at 15, is conduct of the kind that Congresswoman Mace is employed to perform. *See Wuterich*, 562 F.3d at 385 (explaining that a Member of Congress is charged with serving "constituents by advancing legislation . . .").

The alleged defamatory statements in the pre-released version of the speech, in the as-delivered version of the speech, on the poster hung near Congresswoman Mace's Congressional

office, in the Congresswoman's interview, and on the Congresswoman's social media accounts constitute statements about matters of public concern, namely "protect[ing] women and girls . . . ." ECF No. 20-1 at 15. In her speech, Congresswoman Mace described what prompted her to introduce legislation to protect women and girls, specifically her own experience with a "deeply traumatic event" and the uncovering of evidence of "rape, nonconsensual photos and videos of women and underage girls, and the premediated, calculated, exploitation of innocent women and girls in [her] district." *Id.* at 3, 15. She discussed various bills that she introduced, including, among others, the Sue VOYEURS Act, H.R. 1204, 119th Cong. (2025), which would create a civil right of action for victims of voyeurism; the Stop VOYEURS Act, H.R. 1203, 119th Cong. (2025), which would expand a narrow criminal prohibition against video voyeurism at the federal level; the Rape Shield Enhancement Act, H.R. 10094, 118th Cong. (2024), which would change the Federal Rules of Evidence to improve privacy protections for victims who have reported rape; the VANISH Act, H.R. 8387, 118th Cong. (2024), which would criminalize the distribution of revenge porn; and the Increased Accountability for Nonconsensual Pornography Act of 2024, H.R. 8180, 118th Cong. (2024), which would increase the civil penalty for revenge porn. *See* ECF No. 20-1 at 15-16.

The Congresswoman sought to publicize the legislative agenda promoted in her floor speech through various means, including releasing the text of the speech to various media outlets, publishing clips of the speech on her social media accounts, giving press interviews, and hanging posters used in the speech outside of her Congressional office. All of these actions are the kind engaged in by Members of Congress on a daily basis to raise awareness of issues of concern to them and their constituents and to advocate for the advancement of policy initiatives. *See Does 1 through 10 v. Haaland*, 973 F.3d 591, 602 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 2466 (2021)

("Congressmembers routinely broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and, as in the present case, through social media postings.").

In the context of the FTCA and Westfall Act scope-of-employment analysis, federal courts applying District of Columbia law have held that statements to the public by Members of Congress regarding matters of public concern fall within the scope of their employment. *See, e.g.*, *Wuterich*, 562 F.3d at 377-78 (concluding that a Congressman was acting within the scope of his employment when he made allegedly "false and defamatory statements to the press about the role of [the plaintiff sergeant's] squad in the deaths of civilians in Haditha, Iraq in 2005"); *CAIR*, 444 F.3d at 661, 665 (concluding that a Congressman was acting within the scope of his employment when he made an allegedly defamatory statement to the press concerning "his marital status[,]" which "at least some subset of [the Congressman's] constituents were interested in . . .").

A Congresswoman's communications with the public regarding proposed legislation are no different—whether the communication be on the House floor, through the press, through a poster hung near her Congressional office, or on social media. As for the latter, the Supreme Court has recognized the importance of social media in facilitating such communications. "[C]yberspace—the 'vast democratic forums of the Internet' in general, . . . and social media in particular[]"—is among "the most important places (in a spatial sense) for the exchange of views . . . ." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). "Social media allows users to gain access to information and communicate with one another[,]" including to "petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05, 107. "Indeed, Governors in all 50 States and almost every Member of Congress have set up [social media] accounts for this purpose." *Id.* at 105 (internal citation omitted).

The U.S. District Court for the District of Columbia, in a case involving a scope-of-employment question and alleged defamation by a Member of Congress on social media, recently explained that "[c]ourts have routinely found that communicating with the public about newsworthy issues is a core responsibility of lawmakers," and upheld the substitution of the United States as a defendant. *Bobulinski*, 2025 WL 1707696, at *3 (citing *CAIR*, 444 F.3d at 665; *Brewster*, 408 U.S. at 512).

Here, the speech, and the Congresswoman's efforts to publicize the speech, brought attention to the Congresswoman's legislative agenda to improve protections for women and girls who may become victims of sexual violence and exploitation. In short, making such statements to promote her legislative agenda "is unquestionably [conduct] of the kind that Congresswoman [Mace] was employed to perform as a Member of Congress." *Wuterich*, 562 F.3d at 384.

Turning to the second part of the scope-of-employment test, the alleged conduct occurred "'substantially within the authorized time and space limits . . . .'" *Id.* at 383 (quoting Restatement (Second) of Agency § 228(1)(b)). As for the pre-released version of the speech and the poster, Plaintiff alleges that, on February 10, 2025, Congresswoman Mace and the Doe Defendants released "a version of the speech that [Congresswoman] Mace intended to make from the [House] floor that evening to the press . . ." and, after making the speech on the House floor, "Congresswoman Mace chose to hang the post of the 'Predators' in a public space in or near her Congressional office . . . ." Am. Compl. ¶¶ 54, 87. There are no allegations that these actions were taken outside of Capitol Hill or outside "work hours—if indeed there are such limitations on a Representative's work . . . ." *CAIR*, 444 F.3d at 663.

Likewise, the interview and social media posts regarding the Congresswoman's speech were "'substantially within the authorized time and space limits.'" *Wuterich*, 562 F.3d at 383

(quoting Restatement (Second) of Agency § 228(1)(b)). Members of Congress routinely give press interviews to discuss ongoing political and legislative matters, and courts have routinely held such interviews to be within the scope of a Member's official duties. *See e.g.*, *CAIR*, 444 F.3d at 665-66 (finding a "clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively"); *Wuterich*, 562 F.3d at 384-85 (finding a series of media interviews by a Member of Congress to be within the scope).

With regards to the use of social media, the Supreme Court acknowledged, "almost every Member of Congress [has] set up [social media] accounts[,]" *Packingham*, 582 U.S. at 105, which facilitate communication with the public. The Congressional Research Service made the same observation, pointing to the nearly universal adoption by Members of Congress of social media websites. *See* Jacob R. Straus, Cong. Rsch. Serv., R45337, *Social Media Adoption by Members of Congress: Trends and Congressional Considerations* at 3 (2018), *available at* https://fas.org/sgp/crs/misc/R45337.pdf (last visited July 10, 2025) (stating that, by 2018, "nearly all Members of Congress have Twitter, Facebook, and YouTube accounts . . ." to communicate with the public).[5] Likewise, the House recognizes that social media websites are proper mechanisms for Members to conduct official business, including communications with the public. In the *Members' Congressional Handbook*, the Committee on House Administration defines "social media accounts" as "profiles, pages, channels or any similar presence on third-party sites that allow individuals or organizations to offer information about themselves to the public . . . ."

---

[5] This Court may take judicial notice of facts that "can be readily determined from reliable sources, such as the Congressional Research Service . . . ." *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 486 (2021).

Committee on House Administration, *Members' Congressional Handbook* at 39 (adopted Apr. 30, 2024).[6]

Accordingly, the conduct "'occur[red] substantially within the authorized time and space limits'" of the Congresswoman's official duties. *Wuterich*, 562 F.3d at 383 (quoting Restatement (Second) of Agency § 228(1)(b)). The Supreme Court and Congress have recognized that the use of social media is a common way for a Member of Congress in the course of his or her employment to communicate with the public regarding his or her views on public policy or on other official matters.

Finally, the alleged conduct was "'actuated, at least in part, by a purpose to serve the master.'" *Wuterich*, 562 F.3d at 383 (quoting Restatement (Second) of Agency § 228(1)(c)). Regarding the Doe Defendants, Plaintiff alleges that they "aided" Congresswoman Mace "in the conduct described" in the First Amended Complaint. Am. Compl. ¶ 3. As Congressional staff, the Doe Defendants' actions were designed, at least in part, to serve Congresswoman Mace. *See* Exhibit 1. Regarding Congresswoman Mace, as a Member of Congress, her "primary obligation . . . in a representative democracy is to serve and respond to . . . her constituents[,]" and this "service necessarily includes informing constituents and the public at large of issues being considered by Congress." *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995). Her "ability to do [her] job as a legislator effectively is tied . . . to [her] relationship with the public and in particular [her] constituents and colleagues in the Congress." *CAIR,* 444 F.3d at 665. Here, as in *CAIR,* "there was a clear nexus between [communicating with the public on a matter of public concern] and the

---

[6] An electronic copy of the Handbook is available on the Committee on House Administration's website at https://cha.house.gov/members-congressional-handbook. As noted above, this Court may take judicial notice of this governmental website. *See Mays*, 70 F.4th at 206 n.4; *Hilton*, 702 F. Supp. 3d at 430.

[Congressperson's] ability to carry out [her] representative responsibilities effectively." *Id.* at 665-66. The Congresswoman's speech, and related publicization efforts, were intended to serve the purpose of raising awareness and support for her legislative agenda aimed at protecting women and girls from exploitation, voyeurism, and sexual violence. *See* ECF 20-1 at 15-16. These issues are of concern to the Congresswoman, and it is clear that her public statements served, at least in part, to spur government action and legislative reform. *Id.* "Indeed, where comments made in the course of a conversation on as private a matter as marital status are within the scope of a congressman's official duties, it is hard to fathom how [Congresswoman Mace's] discussion of grave public policy concerns relating to . . . [protecting women and girls] could ever fall outside the scope of [her] employment." *Wuterich*, 562 F.3d at 385. Therefore, under District of Columbia law, Congresswoman Mace and the Doe Defendants readily satisfy the scope-of-employment test.

2. **Under South Carolina law, Congresswoman Mace and the Doe Defendants were acting within the scope of their employment.**

Applying South Carolina law, this Court should reach the same outcome. The Supreme Court of South Carolina broadly defines the scope of employment to mean "some act in furtherance of the master's business . . . ." *S.C. State Budget & Control Bd., Div. of Gen. Servs., Ins. Reserve Fund v. Prince*, 403 S.E.2d 643, 646 (S.C. 1991) (internal quotation marks and citation omitted). *See also Berkeley-Dorchester*, 395 F. Supp. 2d at 323 (South Carolina law "takes a decidedly broad view of acts in furtherance of the master's business . . . ."). Moreover, "[a]n act is within the scope of a servant's employment where reasonably necessary to accomplish the purpose of his employment . . . ." *Armstrong v. Food Lion, Inc.*, 639 S.E.2d 50, 52 (S.C. 2006) (emphasis added) (internal citation omitted).

Conversely, an act is outside the scope of employment only if it is "*wholly disconnected with his employment* . . . ." *Id.* (emphasis added) (internal citation omitted). "A mixed motive is

not enough to push the servant[']s acts beyond the scope of his employment." *Childress*, 2008 WL 6716458, at *3. "[T]he fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment." *Carroll v. Beard-Laney, Inc.*, 35 S.E.2d 425, 428 (S.C. 1945) (internal quotation marks and citation omitted). "If the purpose of serving the master's business actuates the servant *to any appreciable extent*, the master is subject to liability . . . ." *Id.* (internal quotation marks and citation omitted).

The South Carolina Supreme Court has applied this scope-of-employment test in the defamation context. The Court has long recognized that "[a] principal may be held liable for defamatory statements made by a servant acting within the scope of his employment or within the scope of his apparent authority." *Abofreka v. Alston Tobacco Co.*, 341 S.E.2d 622, 625 (S.C. 1986) (citing, *inter alia*, Restatement (Second) of Agency § 247). *See also Johnson v. Life Ins. Co. of Ga.*, 88 S.E.2d 260, 263 (S.C. 1955) (citing "numerous decisions" holding a principal liable for "a slander uttered by its agent . . .").

Ultimately, "[w]hat is within the scope of employment may be determined by implication from the circumstances of the case." *Hamilton v. Miller*, 389 S.E.2d 652, 653 (S.C. 1990) (internal citation omitted). The Court may consider whether the individual was "at the job site during normal working hours[,]" and whether the action took place while the individual was engaged in activities "incident to [his or her] general duty . . . ." *Crittenden v. Thompson-Walker Co., Inc.*, 341 S.E.2d 385, 387 (S.C. Ct. App. 1986). Among the factors considered when assessing whether allegedly defamatory statements fall within the scope of employment, courts may look to whether the statements were "made by an employee of the government about a matter of public concern." *Price v. City of Rock Hill*, No. 0:21-cv-02686-TLW, 2022 WL 9822178, at *4-5 (D.S.C. Oct. 17, 2022).

Applying these principles here, the alleged defamatory statements made by Congresswoman Mace and the Doe Defendants were well within their job duties and thus were "reasonably necessary to accomplish the purpose of [their] employment and in furtherance of the [House's] business." *Armstrong*, 639 S.E.2d at 52 (internal citation omitted). The alleged defamatory nature of these communications does not change the analysis. *See Prince*, 403 S.E.2d at 647 (holding that a chairman of a school board's finance committee was "acting within the 'course of his employment'" when he allegedly made defamatory statements at a press conference that "addressed his concerns about the fiscal management of the School District[]"). The purpose of the Congresswoman's speech was "purportedly to shed light on the epidemic of sexual crimes against females in America and to do so through the revelation of [Congresswoman] Mace's alleged personal experiences with [Patrick] Bryant and/or others[,]" as Plaintiff alleges. Am. Compl. ¶ 47. Even if the Congresswoman and Doe Defendants had an additional motive in delivering the speech, releasing the speech to the press, hanging the poster near her Congressional office, giving a media interview, or posting on social media about the speech, that does not take the alleged conduct outside the scope of their employment under South Carolina law. As another court in this district concluded, "[a] mixed motive is not enough to push the servant[']s acts beyond the scope of his employment." *Childress*, 2008 WL 6716458, at *3. Where, as here, the alleged conduct was not "wholly disconnected" from their "employer's business," the Congresswoman and Doe Defendants were acting within the scope of their employment. *Id.* at *4 (internal quotation marks and citation omitted).

### B. This scoping determination is consistent with other cases involving Members of Congress.

Substituting the United States for Congresswoman Mace and the Doe Defendants is fully consistent with other federal courts' treatment of Members of Congress who engaged in similar

conduct. "Federal courts have repeatedly recognized that Members of Congress are acting in their official capacity when they 'broadcast their views on pending legislation and related current events through press releases, televised speeches, interviews, and, as in the present case, through social media postings.'" *Price*, 2022 WL 9822178, at *3 (quoting *Haaland*, 973 F.3d at 600). There are several cases where courts have directed the substitution of the United States for individually-named Members of Congress acting within the scope of their employment, including the following:

- A Congressman made statements on his Facebook page about the arrest of the plaintiff within the Congressman's district, and the plaintiff sued the Congressman for defamation. *Price v. City of Rock Hill*, No. 0:21-cv-2686-TLW-SVH, 2022 WL 16700438 (D.S.C. July 13, 2022), *report and recommendation adopted,* No. 0:21-cv-02686-TLW, 2022 WL 9822178 (D.S.C. Oct. 17, 2022).

- A Congressman posted on "his official social media account" and "his personal account" about the plaintiff's testimony before the House Oversight Committee, describing the testimony as "Russian disinformation" and accusing the plaintiff of "us[ing] a Trump campaign-paid lawyer to make false allegations since October 2020." *Bobulinski*, 2025 WL 1707696, at *1-2 (internal quotation marks and citations omitted).

- A Senator and Congresswoman "issu[ed] a series of tweets in response to a widely publicized incident on the National Mall in which [the] [p]laintiffs were involved[,]" and the plaintiffs filed a "defamation suit" against the Senator and Congresswoman. *Haaland*, 973 F.3d at 593.

- A Congressman made allegedly defamatory statements to the effect that the plaintiff Marine Corps squad leader "deliberately murdered innocent Iraqi civilians in a cold-blooded massacre[,]" and the plaintiff brought a "defamation case" against the Congressman. *Wuterich*, 562 F.3d at 378-79, 382.

- A Congressman in his congressional office made a statement to a reporter that the plaintiff non-profit organization was the "fund-raising arm for Hezbollah[,]" and the plaintiff sued the Congressman "for defamation and slander . . . ." *CAIR*, 444 F.3d at 662 (internal quotation marks and citation omitted).

- A Congressman made a statement in a television interview that the plaintiff was a "bigoted, right wing, redneck, racist wacko[,]" and the plaintiff sued for "defamation, libel, slander, and intentional infliction of emotional distress . . . ." *Chapman v. Rahall*, 399 F. Supp. 2d 711, 713 (W.D. Va. 2005).

- A Senator made a statement to a group of reporters following a fundraising event that the plaintiff non-profit organization had a "national policy [of] firebombing and even murder[,]" and the plaintiffs sued the Senator, alleging "they were each defamed . . . ." *Operation Rescue Nat'l*, 975 F. Supp. at 95, 98-99.

- A Congressman made allegedly "defamatory statements" during a television interview "concerning the status of an appropriations bill[,]" and the plaintiff brought a "defamation suit" against the Congressman. *Williams*, 71 F.3d at 504.

## C.     Whether a particular act is within the scope of employment is a question of law for the Court to decide.

Plaintiff cannot challenge the Certification by relying on conclusory allegations in his First Amended Complaint. *See Doe*, 929 F.3d at 165. Plaintiff alleges that Congresswoman Mace "appeared on the floor to advance a personal vendetta against her ex-fiancé[,]" that the Congresswoman's "speech was nothing more than the culmination of a campaign of blackmail and extorsion against her ex-fiancé[,]" that the Congresswoman was "not arguing for the consideration or passage of any proposed legislation[,]" that the statements at issue were made "outside of the scope of [Congresswoman Mace's] employment as a United States Congresswoman," and that the statements were not "reasonably necessary to accomplish any purpose of [Congresswoman Mace's] employment as a United States Congresswoman." Am. Compl. at 1, ¶¶ 114, 117-118. These "conclusory allegations[,]" *Doe*, 929 F.3d at 165, which are contradicted elsewhere in the First Amended Complaint, warrant no deference from this Court as it assesses the scoping determination. *See* ECF No. 20-1 at 15-16 (attaching to the First Amended Complaint the pre-released version of the Congresswoman's speech, which discusses the Congresswoman's proposed legislation); Am. Compl. ¶ 194 (alleging that Congresswoman "Mace was a federal official acting under federal authority when she delivered a speech that libeled and defamed the Plaintiff").

Moreover, when deciding whether conduct was within the scope of employment, courts focus on the nature of the allegations, rather than simply deferring to how the plaintiff labels the conduct. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 687-88 (1949) (rejecting the view that the "denomination of the party defendant by the plaintiff" is the "sole test of whether a suit was against the officer individually or against his principal, the sovereign"). A court must inquire into whether the "allegations in [the plaintiff's] complaint make clear that [the plaintiff] sued [the] defendants based on acts or omissions within the scope of their federal offices." *Keyter v. McCain*, 207 F. App'x 801, 802 (9th Cir. 2006), *cert. denied*, 549 U.S. 1362 (2007). The scoping determination "is a question of law for the court to decide," not a question of fact. *Brown v. United States*, 933 F. Supp. 2d 780, 784 (E.D. Va. 2013) (internal citations omitted). *Cf. Lewis v. Clarke*, 581 U.S. 155, 162 (2017) (directing, in the context of a motion to dismiss on sovereign immunity grounds, that courts "may not simply rely on the characterization of the parties in the complaint, but rather must determine in the first instance whether the remedy sought is truly against the sovereign") (internal citation omitted).

Accordingly, under either District of Columbia or South Carolina law, because the statements at issue were made within the course and scope of employment of Congresswoman Mace and the Doe Defendants, as the United States Attorney has certified, *see* Exhibit 1, the United States must be substituted as the only defendant.

## III.  CONCLUSION

For the reasons set forth above, this Court should enter an order substituting the United States in place of Congresswoman Mace and the Doe Defendants on Plaintiff's claims for libel *per se*, defamation *per se*, and conspiracy.

[Signature Page Follows]

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

*s/Kimberly V. Hamlett*
Kimberly V. Hamlett (#14049)
Assistant United States Attorney
United States Attorney's Office
151 Meeting Street, Suite 200
Charleston, South Carolina 29401
Phone: (843) 266-1673
Email: Kimberly.Hamlett@usdoj.gov

*s/Robert M. Sneed*
Robert M. Sneed (#07437)
Assistant United States Attorney
United States Attorney's Office
55 Beattie Place, Suite 700
Greenville, South Carolina 29601
Phone: (864) 282-2100
Email: Robert.Sneed@usdoj.gov

July 11, 2025